Good morning, Your Honors. My name is David Corey. I appear on behalf of the plaintiff, Appellant George Butler, in this case. As the Court is aware, this is an Eighth Amendment cruel and unusual punishment case. The injuries to Mr. Butler were tragic. The Court is aware he's a full quadriplegic with brain injury. The issues in the case really are twofold. Number one, how did he come about getting those injuries? Was it as a result of deliberate indifference by certain defendants or part of the Nevada penal system? Well, I apologize. I wanted to save two minutes for rebuttal. So you've got the clock in front of you. Stop when you feel like you need to. I will. Thank you. In any event, the interesting part about this case, Your Honors, is this. What we have here, unlike some of the other deliberate indifference types of cases, are we can't say when we look at a particular defendant, this defendant was given a specific piece of information about George Butler. We may not be able to prove in this case that the named defendants even knew George Butler's name until this event occurred. But what is of interest in this case, and I think what's compelling for Your Honors to consider in this case, is that what decisions are made at a supervisory level to put a flow of events into action, ultimately resulting in a situation where grievous injuries occur to somebody in prison through these decision-making processes in and of themselves can be proof of deliberate indifference. And if I can explain. Sure. Classy. The difficulty, though, is that this is almost like, was it Lear? It's not Lear. Something begins with an L. That is Lear. I mean, as it plays out, what you're really complaining about are seven or eight or nine deficiencies in the way the prison was administered. And I think that's where it could be, our position could be somewhat misread, and if I can be specific, because it's a good question, the one I came prepared to answer. We know that in the situation at the Indian Springs Correctional Facility in Nevada, at the time this event occurred, there had been a large history of fights, problems with prison inmates, all kinds of problems with drugs, Donna Street Crip gang running the prison as far as being able to buy drugs. This whole incident was as a result of a fight that broke out allegedly due to some drug transaction. But what's key is here is what was the administrative process doing to deal with a specific problem with a known risk? Classic are the rocks in the prison yard. We know from the expert testimony from Mr. Rezaza, who was deeply involved in corrections and incarceration work, that you do not take a prison yard and literally allow boulders and chunks of rocks the size of softball available to inmates out in a common yard area. Well, no, but that, you see, that's, I mean, it's remote and removed from what happened. I mean, you're saying but for the rocks, there wouldn't have been people out in the yard with rocks to throw, and that fight wouldn't have started, and but for the fact that the fight started, then Smith wouldn't have been negligent, and but for the fact that Smith wasn't negligent, there would have been no injury. But it's a flow of events, and if I can explain how it hooks together. But that just doesn't fit with Farmer. But it's a surety to this extent. As far as the indifference, the standard of, you know, indifference that we're really talking about is the fact that we know that there's a history of fights at the prison. We know the fights break out because the inmates throw rocks at each other. We know that there's no reason in the world to have rocks out in this area. Let me give you an example. This may sound like a silly hypothetical. What if the warden of this prison knew that in the open area of the yard that was accessible to all the prisoners were a half a dozen Uzis or MAC-10s or some weapons? And the warden said, I just don't have time to go out and police it. I don't feel like I want to do my job. I don't think I need to go out and do that. We know, then, if inmates went out and grabbed weapons and shot at each other, and somebody got killed, that's a surety that something bad is going to happen when you have that environment. Now, I'm not talking about a general prison condition case. I mean, this is not a prison condition case. This is a case where we say you have rocks out in this area. The rocks are accessible. The inmates have a history of fighting with these rocks. It's a certainty somebody's going to get hurt. Then what we have as a follow-up to that is we have the worst thing that can happen at all in a prison, and that's a lockdown that's not a lockdown. We have a lockdown scenario that's not a lockdown. Now, the contention is made that we, that Mr. Butler has to ask for protection. I suggest to the Court that that is not the proper standard, nor is that the standard articulated in the cases. I know the courts have struggled with this on the notion that somehow or another there has to be an animus to the deliberate indifference. Well, you know, I would agree with you that he doesn't have to ask for protection, but there has to be knowledge or awareness. There has to be deliberate indifference. Well, we know that you have to have the prison officials that you sued. Correct. You have got to have knowledge that there is a serious risk of substantial injury to him. The thing is they don't have to know his name, and that's – and I think that's the distinction because I really – because what we're talking about, Your Honor, is this. What says that? I suggest to the Court that the case authority we cited for purposes of supervisor liability for 1983 actions goes for the notion that when the supervisor puts certain acts in motion that is a certain degree of certainty that something's going to happen, that they accept responsibility. Classic. I understand. We talk about Robert Bayer. Bayer is the director of the Nevada Department of Prisons. He's the consummate bureaucrat. We take his deposition. Director Bayer says, I have nothing to do with the day-to-day operations of the prison. Well, that's got to be true, of course. Pardon? That's got to be true, of course. On one side, it may be true. On the other side, it may be just a way to say I don't want to be responsible for what goes on. You know the director is not going to be responsible for the day-to-day operation of a cell block. I mean, that just doesn't compute. Of course it doesn't, except for the problem was this. He said, I delegate the responsibility to run my four institutions to my wardens. Do you meet with the wards? Do you talk about the wards with problems, with gangs, with drugs, with any of these things that are going on? No. I entirely leave it up to them. I turn my back on that, and it's up to them to do it. And I suggest to the court that when you are in a supervisory position, you're entitled to have information presented. You can make policy. If you say, I'm not going to make any policy, that's deliberate indifference. Now, you can say, sure, I'm busy. Your Honor, we're all busy. We all have jobs. The highest job in the country is the president. But for the president to say, I'm not responsible for the decisions that I choose to make or not to make, would be inappropriate, as it would be for Mr. Bayer to say, I don't care. I have no responsibility. Bayer doesn't have to know George Butler. But it's classic. In this situation, we know that we have the rocks in the prison yard. We have the fight. We have the gang. We have the gang problem. We have the retaliation. We have George Butler in a cell block, isolated and locked in. We have understaffing. We have Guard Smith, who on one minute says there's no procedure. Another witness says there is a procedure. Somebody says he didn't follow a procedure. Somebody said, well, I don't even know what's going on, and nobody tells me. He leaves the area that he can observe the inmates. He walks away. And then this horrible thing happens because nobody's taking care of business. And I suggest to the Court the reason nobody's taking care of business is a factually established by deliberate indifference. And the only issue I would suggest to the Court is, is do we have enough facts to make a reasonable presentation that somebody can make the factual finding? And we have to look at the specific conduct as to whether or not it's objectively reasonable or not. And, you know, that's our position. Okay. I'll save my two minutes. Do I have the stop button? Sure. Thank you, Mr. Corey. Thank you. Mr. Lindstrom. Good morning, Your Honors. If it pleases the Court, I'm Richard Lindstrom, the Assistant Solicitor General for the State of Nevada on behalf of the Attorney General's Office, representing the appellees in this matter. I would beg the Court's indulgence in stating the obvious, and that is that each of these defendants has to be looked at individually and separately as to liability. Now, this is important because plaintiff uses the language of flow of events, but the analysis is really more of a respondent superior type analysis, that everyone up the chain of command is responsible for the actions of their subordinates, which clearly cannot be applied in this type of case. Either that, or they're saying it's kind of a rest ipsa thing. If this kind of thing happens in a prison, someone must be liable. Someone must have violated the Eighth Amendment. Well, that also is not the proper analysis. And I would suggest that if we're looking to see if what happened would be intolerable under the standard, you can't say that it rises to that. Even as an example, Mr. Skolnick, the Assistant Director, he was in charge of prison industries. He comes to plaintiff's attention because he makes a statement to the press, which is his other job, and he has nothing true. He doesn't know Mr. Butler's name. He also has nothing to do with setting into flow the policies that supposedly caused these injuries, if in fact they did. But more importantly, there really is no evidence in any of this that Mr. Butler was voluntarily subjected to this lack of protection. The record shows the doors were on what they call local control. In other words, they could only be opened from the inside. So Mr. Butler had to let himself out. So what does that tell us? Well, Mr. Smith released the doors or did whatever was necessary to allow the prisoner to exit from the cell, correct? But only the prisoner could exit. Nobody could come in without Mr. Butler's ability to do it, or Mr. Butler could let himself out. Well, were they told they had to remain in their cells until they were instructed to exit? I don't think the record would say that. But when he released, when Smith released the latch or whatever he did in the bubble, the prisoners could exit the cell at any time they wanted to. Conceivably, that's true, and we'd have to say that most favorably to the plaintiff. But what it tells us is Mr. Butler had no fear, that he didn't perceive himself as being in a situation where he was in danger from people. If that's the case, how can the director of prisons think that Mr. Butler should be in fear? Or how should the warden think that Mr. Butler should be in fear? Or poor Mr. Skolnickoff, taking care of prison industries, how is he supposed to know someone's supposed to be in fear in that situation? Perhaps the most forceful argument for liability on the part of one of the defendants, of whom, of course, Smith is not one, perhaps because he was just negligent. I don't know why he's not. But the one person who did something isn't a defendant. Right. The perhaps the most forceful argument is that having had this riot, basically, the big fight, and having the warden having decided properly to impose the lockdown improperly, let it be ineffective. In other words, let the lockdown kind of disintegrate because it wasn't adequately staffed. And he knew that it wasn't adequately staffed to keep the lockdown fully operational. What's your response to that? Well, plaintiff's expert says that that is some kind of a flawed custom and policy, he says. But, first of all, there's no evidence that that was actually a policy in place, that the lockdown was not supposed to be effective. Arguably, it is effective because the inmates themselves can only let themselves out. So in terms of just protecting people in there, that shouldn't really be an issue. And the other thing is what that kind of does is say, well, everyone who's ever in a rumble on the prison yard is somehow in the same situation or vulnerable situation as the transsexual and farmer, that somehow there should be subjective knowledge on the part of the prison officials that everybody who's tangentially in a fight is subject to be beaten up immediately thereafter. And, interestingly enough, the whole situation and history of the rocks proves to the contrary. These rocks have been there forever. It's a desert. Those rocks are always going to be there. And Skolnick's testimony in deposition is twice they've had the power go out and the rocks were kind of thrown around a little bit, but no one was ever harmed. No one's ever had a serious thing like that happen. And there's no indication that somehow it offends decency to have the rocks on the yard or that it would even be practicable to remove the rocks. The place is made out of rock. There's just no sense that that's something that set in motion this whole chain of events. And that's really our point on the whole business of why these people are liable. If you take kind of a Bergquist analysis, was there gross negligence in the supervision and training? Well, there's no evidence of gross negligence. Even their expert says, well, Butler should have been isolated. I have an opinion that the managers failed to inform Smith of the reasons for the lockdown. That doesn't say there's a policy to do that. It says there's a slip-up or negligence that particular time that Smith wasn't told. Smith should have inquired. Once again, Smith was negligent, but is it the policy that Smith doesn't inquire? No. Under his deposition testimony, he was late to work that day, and the policies apparently were not followed. And then the release for meals without an escort is a flawed customer policy. Once again, no evidence ever reduced that that is a customer policy. It's what happened in this particular situation. And really, had Butler not let himself out, it wouldn't have had any problem. There was a huge error in judgment in this scenario, but it was Butler's in letting himself out. If he was really in so much danger, he shouldn't have done that. And how the prison officials are supposed to know that he's going to let himself out and put himself in that danger obviates their subjective knowledge that this could have happened. But there was no dispute that Butler was involved in the fight the day before. Is that right? It seemed like he was helping somebody else out in the fight. There really isn't testimony that he was a gang member. In fact, quite the contrary. The record shows that on intake, he specifically denied gang membership, said he had no fear from anybody else in the prison, and he himself was a violent offender. Deposition testimony from Dwyer that he was one of the tough guys on the yard. And so to the extent that subordinates of any of the named defendants would have known the characteristics of this plaintiff, his characteristics were that he was a violent aggressor, not that he was going to be likely to be harmed by anybody. It was also fairly well known that there was tensions between the black prisoners and the white prisoners. Isn't that correct? Well, you know, they say that, but the question is, does that rise to the level of something that can be eliminated by a policy or procedure? Obviously they control violence, but all of the defendants in their depositions admit candidly there will always be tension in the prison, there will always be some level of violent outbreaks, and their job is to control it to the best they can. And there's really no evidence that somehow the director was sitting there and called the warden and said, hey, don't bother taking care of any of this. Because what they really tried to do is put the prison system on trial and say that, well, they've never removed the rocks, and then they've got these arguments that the prisoners were running the place, drugs were rampant. Well, none of that really is in the testimony. That's characterizations by counsel stringing together various answers and depositions here and there. For this prison, what did it mean when they said the prison is going to be on lockdown, for this particular prison? What was the effect of that? Well, the record indicates in this case what it means is that they were put in their cells and by unit put on local control while groups of prisoners were taken to eat. That's what it means on the record in this case. What they meant overall by policy in lockdown never came out in testimony anywhere. The one vulnerability I think we have in this case is there's language in the district court decision indicating that, well, he didn't tell them, therefore liability. But one place the court kind of says that, the other place it says, for example, he didn't tell them. And I think what the court is saying, what the court below is saying is, under these circumstances it was reasonable that he would have told them because otherwise he was known not to be somebody who would be a victim. But the fact that he didn't tell them or didn't say anything is not outcome determinative. They could establish knowledge through other means. That's right. Not that they did. Under farmer. Exactly. And that's our point. That's what I wanted to say with reference to that. Our conclusion in this is that appellant had basically a garden variety state negligence claim against the state. They needed to make it a federal case because of the tort cap in state court that would limit them to $50,000. But they haven't been able to show under the relevant law that they come to that standard. And so we suggest that the district court was correct. I have only one question. And that is your point about the prisoner having to unlock the door from the inside totally escapes me. Now, are you saying that he could have stayed in there and locked out the rest of them? Correct. He could have skipped the meal and stayed in there? Well, no. Assuming eventually a corrections officer would have come back and probably told him he has to go eat and taken him there. But the point is, during the time when there was no corrections officer in direct supervision, he was safely within his cell and it was solely within his ability to open the door and let him come out. So your point is that he felt threatened. He could have, in effect, locked the world out until he was ready to go. Is that your point? Well, until a corrections officer came back and ordered him otherwise. But what I'm saying evidentially, what it says is he wasn't afraid. Okay. Thank you. Okay. Mr. Corey. Thank you, Your Honor. Your Honor, the problem with the notion that George Butler had some control on what he was going to do about letting him out of the cell is just not what the record reflects. Correctional officer Smith said that there's a light procedure that signals the inmates in a particular wing that their cell doors are being opened and that's the time for them to be released for their meal. He hits a button and it releases all of these doors. It allows the doors to swing open and them to come out. That's what the record shows. Now, what happened here was because they were splitting another wing, the so-called B wing, Smith had to leave his bubble where he could see everything that was going on and had to go down to the B wing and hand open half of the wing. Now, when he did that is when this incident occurred when there wasn't surveillance. As the Court is aware, we have filed the appellant's excerpts of record, and at 237 of our excerpts, we specifically have identified a total breakdown of any reasonable policy and procedure for handling prisoners in a lockdown situation. And that's what Mr. Rosazzo identifies. The appropriate procedure is you have an escort team that escorts people in a lockdown scenario. There was no escort team. There was a disregard of the lockdown. So in essence, what we have here is the defense is trying to say, gee, this is George's responsibility to presume the lockdown is going to break down. And that's ludicrous. George can rely on that lockdown as much as anybody else can rely on that lockdown. He's entitled to, and that's what the Eighth Amendment allows. Quickly, I have 43 seconds. A major portion of this case that was missed by the district court, and I'm afraid I'm going to miss it myself, is the medical side. The law says that as part of Mr. Butler's rights under the Eighth Amendment, he's entitled to proper medical care. A failure to provide medical care and live up to medical obligations is cruel and unusual punishment. They took this guy and dumped him out on the street, a full quadriplegic, and the officer that dropped him, the court is aware of this in the record, said I wouldn't treat my animal that way. The district court never even addressed that issue. That issue alone entitles us to a trial on the facts of this case. There's no dispute there that the treatment of George Butler by the prison system was horrible at the beginning, and it just got to continue to get worse. Thank you. Okay. Thank you. Counsel, thanks for the argument just made, and the matter just argued will be submitted.
judges: Leavy, Rymer, Paez